**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| RANDALL HALL, | ) | |
| | ) | CASE NO. 1:08cv1467 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| MICHAEL J. ASTRUE, | ) | MAGISTRATE JUDGE GREG WHITE |
| Commissioner of Social Security | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Randall Hall ("Hall") challenges the final decision of the Commissioner of

Social Security, Michael J. Astrue ("Commissioner"), denying his claim for a Period of

Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income

("SSI") under Title II and Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423,

1381 *et seq*.  The Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the

undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule

72.2(b) for a Report and Recommendation.

For the reasons set forth below, this Court recommends that the final decision of the

Commissioner be AFFIRMED.

## I.  Procedural History

On June 5, 2003, Hall filed an application for POD, DIB, and SSI  alleging a disability onset date of October 1, 2002 and claiming that he was disabled due to eczema, degenerative joint disease, and depression.

Initially, a hearing was held before an Administrative Law Judge ("ALJ") on January 3, 2006.  Hall's claim of disability was denied by the ALJ on January 26, 2006.  Hall appealed to the Social Security Administration's Appeals Council, which vacated the decision and remanded the case for further proceedings to include an analysis of Hall's mental limitations.  (Tr. 224-25.)

On February 8, 2007, a second hearing was held during which Hall, represented by counsel, testified.  Robert Newman testified as a medical expert ("ME") and Kevin Yi testified as a vocational expert ("VE").  On March 23, 2007, another ALJ found Hall was able to perform a significant number of jobs in the national economy and, therefore, was not disabled.  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.

On appeal, Hall claims the ALJ erred by: (1) improperly rejecting the treating physician's opinion; (2) failing to comply with the Appeals Council remand; and (3) applying an inaccurate hypothetical for purposes of the VE's analysis.

## II.  Evidence

### Personal and Vocational Evidence

Born on December 28, 1958 and age forty-nine (49) at the time of his second administrative hearing, Hall is a "younger" person.  *See* 20 C.F.R. § 404.1563(c) & 416.963(c).

2

Hall has a tenth-grade education and past relevant work as a pipe-fitter, automobile parts clerk, and painter.

***Medical Evidence***

On November 1, 1994, Hall underwent an MRI of the cervical spine. The treating radiologist, Walid Massarweh, commented that there was hypertrophic spurs/disc complex posteriorly to the right L3 and the appearance of disc extrusion or protrusion posteriorly to the left C5. (Tr. 332.). He further noted that both of the above conditions would cause a mild impression on the cervical cord. *Id.*

On August 30, 2001, Hall was seen by dermatologist James Taylor, M.D. (Tr. 170.) Dr. Taylor diagnosed Hall with mildly pruritic intermittent dermatitis involving his hands, feet, and trunk. *Id.* Dr. Taylor noted that Hall showed improvements with the use of Fluocinonide cream and Prednisone. *Id.* Dr. Taylor recommended further allergy patch testing, modification to Hall's medication, and an analysis of Hall's pertinent Material Safety Data Sheets. *Id.*

On December 16, 2002, Hall was seen by dermatologist William S. Mirando, M.D., in regards to the scaling and rash on Hall's hands and feet. (Tr. 275.) Dr. Mirando diagnosed Hall as suffering from infected psoriasiform dermatitis. *Id.* Dr. Mirando referred Hall to Seth Stevens, M.D., for a second opinion. *Id.*

On December 17, 2002, Dr. Stevens examined Hall and determined that he was suffering from either dyshidrotic or possibly contact dermatitis. (Tr. 127.) Hall informed Dr. Stevens that he would rather have his treatment at the University Hospitals and that he had previously seen Dr. Taylor. Dr. Stevens agreed that Hall would be well taken care of through continued treatment by Dr. Taylor. Dr. Stevens also scheduled a patch test with dermatologist Susan

Nedorost, M.D.  *Id.*  Hall was instructed to bring his gloves, boots, and material safety data sheets from work to help guide Dr. Nedorost in her examination.  *Id.*

On January 1, 2003, Dr. Mirando evaluated Hall for a second time.  He affirmed his prior diagnosis as infected dermatitis.  (Tr. 277.)  Hall told Dr. Mirando he had success in the past with steroid injections but that he had experienced some recent flare-ups.  *Id.*  Dr. Mirando prescribed further steroid injections.  *Id.*

On January 31, 2003, Hall complained to Dr. Mirando that he could not afford the steroid creams.  (Tr. 279.)  As an alternative, Dr. Mirando prescribed oral pills.  *Id.*

On February 6, 2003, Hall was examined by Dr. Nedorost, who prescribed Prednisone and scheduled a patch test for the following week.  (Tr. 292.)

On February 20, 2003, Dr. Nedorost conducted the patch test.  (Tr. 289.)  It revealed a reaction to 2-mercaptobenzothiazole, wool alcohols, carba mix, and thiuram mix.  *Id.*

On February 27, 2003, Dr. Nedorost discussed with Hall the results of the patch test, and informed him of avoidance options.  (Tr. 289.)

On March 10, 2003, Hall complained to Dr. Nedorost about swelling in his feet and hands.  (Tr. 114, 289.)  Hall also told Dr. Nedorost that he had yet to purchase the avoidance products.  *Id.*  Dr. Nedorost emphasized the need for Hall to follow the instructions to avoid certain allergens so as to prevent flare-ups.  *Id.*

On April 28, 2003, Dr. Mirando re-affirmed his diagnosis of infected dermatitis and continued a steroid injection and oral medication plan.  (Tr. 280.)

On May 16, 2003, Hall again saw Dr. Mirando because of a flare-up.  (Tr. 282.)  Dr. Mirando noted that Hall had seen several doctors, but with minimal positive impact.  *Id.*

4

On July 18, 2003, Dr. Taylor issued a report to Dr. Mirando.  (Tr. 167.)  Dr. Taylor noted that he had examined Hall on June 5, 2003 and found him to be "markedly disabled by the severe weeping, eczematous, dermatitis."  *Id.*  He also stated that he was unable to obtain Hall's previous patch test results from Dr. Nedorost.  *Id.*  In the same report, Dr. Taylor further discussed his July 10, 2003 examination of Hall.  *Id.*  During that exam, Dr. Taylor observed that Hall's condition had markedly improved.  *Id.*

On July 22, 2003, John Popovic, M.D., completed a questionnaire for the Bureau of Disability Determination and indicated that Hall suffered from severe dermatitis and should refrain from work.  (Tr. 144-45.)

On August 28, 2003, Dr. Popovic submitted a statement to the Bureau of Disability Determination.  (Tr. 340-41.)  Therein, he stated that he had treated Hall since 1994, shortly after Hall was electrocuted.  *Id.*  Dr. Popovic further outlined his treatment for the electrocution until 1996.  *Id.*  Subsequently, in September of 1998, Hall complained to him about his skin.  *Id.*  Dr. Popovic continued sporadic treatment for Hall's skin condition until 2001 when Hall began visiting the Cleveland Clinic for treatment.  *Id.*  Dr. Popovic stated that the last time he saw Hall was in 2003.  *Id.*  He concluded that Hall could not work due to his severe dermatitis.  *Id.*

On October 23, 2003, Paul T. Heban, M.D., completed a Residual Functional Capacity Assessment ("RFC").  (Tr. 156-161.)  He opined that Hall has no exertional, postural, or manipulative limitations.  *Id.*  He further reported that Hall did have an environmental limitation for even moderate exposure to wetness.  *Id.*  Dr. Heban concluded that Hall's symptoms are attributable to a medically determinable impairment and that the severity of those symptoms is what one would expect.  *Id.*  He noted that Hall's statements were partially credible and that his

5

compliance with medical instruction and treatments would result in effective treatment.  *Id.*  On

January 30, 2004, Robert E. Norris, M.D., affirmed Dr. Heban's assessment.  (Tr. 161.)

On February 4, 2004, Hall underwent an x-ray of his lumbar spine.  (Tr. 174-75.)  The

test revealed minor degenerative change and minimal degenerative joint disease.  *Id.*

On May 14, 2004, Dr. Taylor reported that Hall would be able to stand/walk for one to

four hours in an eight-hour work day.  (Tr. 165.)  He also reported that Hall would have no other

functional limitations so long as he avoided certain allergens and wore special shoes.  *Id.*

On June 4, 2004, Stephen Jacobs, M.S., L.P.C, a rehabilitation counselor, opined that

most of the allergens that impact Hall "permeate most, if not all, workplaces."  (Tr. 36.)  Jacobs

also stated that, although Hall declined a work evaluation, if one was completed "it would be

very difficult, if not impossible, to place him in a job which he is capable of handling."  *Id.*

On March 9, 2005, Hall was examined by David Mandel, M.D.  (Tr. 181.)  Dr. Mandel

diagnosed Hall as having degenerative arthritis of the lumbar spine and paralumbar spinal

muscular spasm.  *Id.*  The bone densitometry conducted on March 7, 2005 showed mild bone

loss at the body of L1.  *Id.*  Dr. Mandel also suggested that Hall pursue water therapy and

physical strength therapy.  *Id.*

On April 7, 2005, a Discharge Report from NovaCare Rehabilitation indicated that, after

nine visits, Hall's prognosis was good, with compliance.  (Tr. 176.)  The report further stated

that Hall had a current pain level of 7 of 10 with 10 of 10 being his worst pain showing and 5 of

10 being his least.  *Id.*

On August 15, 2005, Hall's psychiatric condition was evaluated by two doctors from

Ashtabula Community Counseling.  (Tr. 194-203.)  The report stated that Hall suffered from

Major Depressive Disorder, Single Episode, and demonstrated a current Global Assessment of Functioning score of 48.[1]  *Id.*

On August 26, 2005, Thomas Rawa, M.D., examined Hall.  (Tr. 206-8.)  After documenting Hall's complaints, Dr. Rawa diagnosed Hall as suffering from depression, not otherwise specified, and assigned Hall a GAF score of 55.  *Id.*  Dr. Rawa also suggested Hall visit a therapist on a continuous basis, though Hall was adverse to undergoing such treatment. *Id.*

On October 6, 2005, Dr. Popovic reported that Hall had chronic back, knee, and hip pain as well as insomnia and skin allergies.  (Tr. 210-12.)  He further noted that Hall's health status was deteriorating.  *Id.*  Dr. Popovic concluded that Hall's functional limitations would last for at least twelve months and that he was unemployable.  *Id.*

On May 8, 2006, Dr. Popovic reported that Hall was permanently disabled due to severe skin allergies, chronic and acute degenerative disc disease and bilateral hip arthritis.  (Tr. 265.)

On May 15, 2006, Ronald Yendrek, D.O., conducted a psychiatric examination of Hall. (Tr. 261.)  He determined that Hall was suffering from depression and other medical issues, but further commented that he was suspicious of Hall's malingering.  *Id.*

On September 29, 2006, Dr. Yendrek conducted another examination of Hall.  (Tr. 246.) In that report, Dr. Yendrek reaffirmed his belief that Hall might be malingering and speculated as to that being the reason the first ALJ denied his application for disability.  *Id.*  He also stated that

---

[1] A GAF score between 41 and 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning.  A person who scores in this range may have suicidal ideation, severe obsessional rituals, no friends, and may be unable to keep a job.  *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. revised, 2000).

Hall's mood was slightly dysphoric and that he continued to suffer from depression.  *Id.*

### Hearing Testimony

At the hearing, Hall testified that he worked in a dust and chemical filled environment.  (Tr. 429.)  He said that he had always worked in unclean environments.  (Tr. 431.)  Hall testified that he takes several medications to manage his pain.  *Id.*  He further stated that he is compliant in taking those medications according to their prescribed instructions.  *Id.*  He also related that he suffers from pain in his legs if he stands for approximately ten or fifteen minutes.  (Tr. 434.)  Additionally, he testified that he can only sit for fifteen to twenty minutes.  (Tr. 435.)  Hall mentioned that his need for repositioning is also applicable when he sleeps and that he only sleeps about four hours a night.  *Id.*  He said that he takes sleeping pills to aid his sleep.  *Id.*  Hall also testified that his attorney, Mr. Courtney, referred him for a psychological consultation.  (Tr. 436.)  Hall said that the doctors there prescribed another medication.  *Id.*  He further testified that the medications for his psychological limitations cause him to have trouble remembering daily tasks.  (Tr. 436.)

Hall stated that he lives with his mother and that she does a majority of the cooking and cleaning.  (Tr. 438.)  When asked if he could do those tasks, Hall stated he could do them to a certain extent, but that the standing involved in most tasks prohibits his ability to do them frequently and for an extended amount of time.  *Id.*  He testified that he watches television for most of the day and that it causes him to fall asleep.  (Tr. 439.)

Hall admitted that he has had thoughts of suicide.  (Tr. 439-40.)  Additionally, he has lost interest in many of the things he used to enjoy because he is depressed.  (Tr. 440.)  He also stated that he has difficulty concentrating and that his lack of ability to concentrate made it impossible

8

to take the GED exam.  *Id.*  Hall stated that, though he understands he suffers from depression, he did not seek immediate psychological attention from a professional because he did not want to relive the issues that created his depression.  (Tr. 447.)

When the ALJ asked Hall about the use of the respirator at work, Hall stated that he had trouble using it because he could not breathe.  (Tr. 443.)  Although he smokes and testified that he was unable to quit, he stated that he was not allergic to cigarette smoke or the tobacco.  (Tr. 444.)  Hall testified that he was, however, allergic to approximately 900 substances.  (Tr. 448.)

The ME testified that Hall suffered from eczematoid type dermatitis and back pain caused by degenerative osteoarthritis.  (Tr. 453.)  He testified that the osteoarthritis was indicated by the x-rays that show a narrowing of the L5 and S1 with small anterior osteophytes. (Tr. 454.)  The ME also testified that, while Hall had apparent joint pain, minor generative changes, and minimal degenerative joint disease, none of these conditions could cause Hall's alleged pain level.  (Tr. 455.)  He commented that the symptoms that should be apparent according to Hall's alleged pain level would include loss of reflexes and electromyography of nerve conduction–none of which were in the medical record.  *Id.*

The ME also testified that there was insufficient objective medical evidence to warrant the heavy narcotic medication prescribed to Hall.  (Tr. 458.)  In providing his own opinion of Hall's case, the ME stated that he did not think Hall's back pain was substantiated by the medical evidence.  *Id.*  As for Hall's dermatitis, the ME specifically asked Hall how often and severe his flare-ups were.  In response, Hall stated that he had experienced four or five flare-ups in the past year but was able to control them with the prescribed cream.  (Tr. 457.)  The ME testified that none of Hall's impairments, when taken individually, met any of the listed

9

impairments in Appendix 1. *Id.* He further stated that no combination of his impairments met the listings in Appendix 1. (Tr. 458.) The ME concluded that Hall could lift twenty pounds frequently and forty pounds occasionally. He also thought Hall would be able to push and pull without any limitations. The ME testified that Hall would be able to sit between four and six hours out of a typical eight-hour day, and he would also be able to stand and walk for six hours out of an eight-hour day. (Tr. 459.)

The ME agreed with the ALJ that Hall should be precluded from using ropes, ladders, scaffolds, or working at unprotected heights. *Id.* The ME also agreed with the ALJ that Hall's medications should preclude him from dangerous moving machinery, hazardous work environments, or driving automotive equipment. (Tr. 460.) The ME testified that Hall could not tolerate hot weather. *Id.* He testified that Hall would not have any limitation on his extremities or posture so long as he avoids friction on his skin and manages his flare-ups with his medication cream. *Id.*

The ME commented that, in regards to Hall's smoking habits, it could be directly affecting his allergies, but that Hall may not be as sensitive to tobacco smoke as some of the other alleged allergens. (Tr. 461.) The ME also testified that, given there was no MRI or EMG examination available in the record, he disagreed with Dr. Popovic's assessment of Hall.[2] (Tr. 462.)

The VE testified to Hall's job placement according to the two hypothetical scenarios

---

[2] Although Hall cites an MRI examination that was administered by Dr. Massarweh (Tr. 332), during questioning at hearing, Hall's attorney seems to agree with the ME that there was no MRI stating: "With regard to the back pain my client's complained of I recognize there are no MRI's or EMG's." (Tr. 462.)

10

posited by the ALJ.  In the first hypothetical, the subject would be limited by the following: he should wear gloves that do not irritate his skin allergies; he should avoid exposure to rubber or leather with his hands and feet; he must be in a low-stress environment with minimal interaction with the public; he must be given routine tasks; he must be in a work environment free from dust, fumes, or gases; he should avoid unprotected heights and ladders, ropes, and scaffolds; he should avoid dangerous moving machinery, hazardous work environments, driving automobile equipment, and extreme temperatures; and he could stand for six hours and/or sit for six hours in a typical eight-hour work day.  (Tr. 464.)

In the second hypothetical, the VE was asked to consider all of the limitations set forth in the first hypothetical with the addition that the subject should be limited to lifting ten pounds frequently and twenty pounds occasionally and he must have a sit/stand option.  (Tr. 465.)

The VE testified that neither of the two hypothetical scenarios allowed for medium work. (Tr. 470.)  He further testified that, under either hypothetical, such a person could work as a security surveillance monitor, a mail-room clerk, an address clerk, or an order caller.  (Tr. 471-73.)

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a

11

continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[3]

A claimant is entitled to a POD only if: (1) he had a disability; (2) *he* was insured when she became disabled; and (3) he filed while he or she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Hall was insured on his alleged disability onset date, May 25, 2003, and remained insured through the date of the ALJ's decision, January 26, 2006.[4] (Tr. 13.) Therefore, in order to be entitled to POD and DIB, Hall must establish a continuous twelve month period of disability between May 25, 2003 and January 26, 2006. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

A claimant may also be entitled to receive SSI benefits under the Act when he establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human*

---

[3] The entire five-step process entails the following: First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled. For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

[4] Hall initially claimed an alleged onset date of October 1, 2002. However, the first ALJ found that Hall had performed substantial gainful activity as a pipefitter from October 1, 2002 to May 24, 2003. Therefore, at the first hearing, the ALJ determined Hall's claim of disability from May 25, 2003 through the date of her decision on January 26, 2006. (Tr. 218.)

*Servs.*, 667 F.2d 524 (6ᵗʰ Cir. 1981).  To receive SSI benefits, a claimant must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

### IV.  Summary of Commissioner's Decision

The ALJ found that Hall established medically determinable, severe impairments, due to dermatitis, degenerative arthritic changes of the lumbar spine, depression, and substance abuse. (Tr. 15.)  However, his impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  Hall is unable to perform his past work activities, but has a Residual Functional Capacity ("RFC") for a limited range of medium work. The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Hall is not disabled.

### V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6ᵗʰ Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6ᵗʰ Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4ᵗʰ Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI.  Analysis

Hall claims the ALJ erred by: (1) failing to comply with the Appeals Council remand; (2) improperly rejecting the opinion of Hall's treating physician; and (3) applying an inaccurate hypothetical for the purposes of the RFC determination.  Each will be discussed in turn.

### *Compliance with the Remand*

Hall first asserts that, on remand, the ALJ should have requested that a medical expert address the psychological aspect of Hall's claim.  (Pl's. Br. at 8.)  He also maintains that the ALJ should have ordered a consultative examination to assess Hall's psychological condition.  *Id.*  It is Hall's contention that in providing neither, the ALJ committed reversible error when he made expert like determinations regarding psychological impairments.

On remand, the Appeals Council provided the following instructions in relation to Hall's mental condition:

> Obtain additional evidence concerning the claimant's impairments...the additional evidence **may include**, **if warranted and available**, a consultative psychiatric/psychological examination with a medical source statement about what the claimant can still do despite the impairment(s).
>
> Evaluate the claimant's mental impairment(s) in accordance with the special technique described in 20 C.F.R. 404.1520(a) and 416.920(a), documenting application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas described in 20 C.F.R. 404.1520a(c) and 416.920a(c).

(Tr. 225)(emphasis added.)

According to these instructions, a consultative psychological examination was not mandated.  The Appeals Council clearly placed the issue within the discretion of the ALJ.  As such, the ALJ was not required to order a consultative examination unless he determined that the medical record alone was insufficient to evaluate Hall's mental condition.  Additionally, the

14

Appeals Council further instructed the ALJ to adhere to the relevant sections in the regulations when evaluating Hall's mental impairments.  The "special technique" contained in 20 C.F.R. § 404.1520a(e)(3), in relevant part, states that "... *if* the administrative law judge requires the services of a medical expert to assist in applying the technique but such services are unavailable, the administrative law judge may return the case to the State agency ..."  20 C.F.R. § 404.1520a(3) (emphasis added).  It is clear that the regulations place the discretion to request the assistance of an ME squarely within the ALJ's discretion.

The Commissioner argues that there was sufficient medical evidence in the record for the ALJ to make a determination concerning Hall's mental impairments.  He further argues that the ALJ imposed work restrictions that incorporated Hall's mental limitations such as a low-stress environment, minimal interaction with the public and co-workers, and avoidance of job tasks that require arbitration, negotiation, confrontation, and responsibility for the safety or welfare of others.  (Def's. Br. at 11.)  The Commissioner contends that all of the above factors were included in the RFC analysis by the ALJ.  He relies on *Foster v. Halter*, 279 F.3d 348, 356-58 (6th Cir. 2001) wherein the Sixth Circuit held that "the regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination."  (Def's. Br. at 13.)  The *Foster* Court determined that because there was already sufficient evidence in the record to evaluate the mental condition of the claimant and to properly assess the RFC, the ALJ did not abuse his discretion.  *Id*.

In his decision, the ALJ references several instances where it would be necessary to consider Hall's mental condition.  First, the ALJ addresses the psychiatric evaluation by Dr.

Rawa.  (Tr. 15.)   Dr. Rawa's assessment included an analysis of Hall's stress, depression, and substance abuse.  *Id.*  The ALJ also included Dr. Rawa's description that Hall was alert, oriented, coherent, relevant, and organized in his ideation.  (Tr. 18.)  Second, the ALJ considered Hall's mental impairments according to the guidelines set forth by 20 C.F.R. Pt. 404, Subpt. P, App. 1, listing 12.00 (Criteria "B").  Specifically, the ALJ determined that Hall's mental impairments do not rise to the listing level, but they do create limitations.  These included mild limitations in daily activities, moderate limitations in social functioning, and moderate limitations in concentration, persistence, and pace.  (Tr. 16.)  Finally, the ALJ incorporated Hall's mental limitations into the RFC analysis.  He notes that, in determining Hall's RFC, he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence..." *Id.*  The ALJ allowed Hall only a low-stress work environment with limited contact with the public, coworkers, or supervisors.  *Id.*  This finding by the ALJ clearly shows he considered Hall's mental limitations and the impact Hall's work environment has on his ability to do meaningful work.  Further, the limitations imposed by the ALJ illustrate that Hall's mental limitations were incorporated into the RFC finding.

This Court concludes that there was sufficient evidence in the record to support the ALJ's findings.  Moreover, because there was sufficient evidence, the ALJ was not required to order a consultative examination or appoint an ME.

### Rejection of the Treating Source

Hall also argues that the ALJ erred by rejecting the opinion of his treating physician, Dr. Popovic.  (Pl.'s Br. at 10.)  Specifically, Hall refers to Dr. Popovic's opinion that he cannot

16

perform any work activity.  *Id*.  In his decision, the ALJ applied little weight to Dr. Popovic's opinion because Dr. Popovic admitted Hall was noncompliant and also because his opinion was undermined by the opinions of treating dermatologists.  (Tr. 19.)

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Meece v. Barnhart*, 192 F. App'x 456, 560 (6th Cir. 2006) (*quoting* 20 C.F.R. § 404.1527(d)(2)).  "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*, 2009 U.S. App. LEXIS 21132 at *22 (6th Cir. Sept. 24, 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 192 F. App'x at 460-61 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.)  Furthermore, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 2009 U.S. App. LEXIS 21132 at *22.[5]

Nonetheless, the opinion of a treating physician must be based on sufficient medical

---

[5]  Pursuant to 20 C.F.R. § 404.1527(d)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

17

data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d

431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 2009

U.S. App. LEXIS 21132 at *16 ("It is an error to give an opinion controlling weight simply

because it is the opinion of a treating source if it is not well-supported by medically acceptable

clinical and laboratory diagnostic techniques or if it is inconsistent the with other substantial

evidence in the case record.") (*quoting* SSR 96-2p).  Moreover, the ALJ is not bound by

conclusory statements of a treating physician that a claimant is disabled, but may reject

determinations of such a physician when good reasons are identified for not accepting them.

*King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human*

*Services*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir.1984).

According to 20 C.F.R. § 404.1527(e)(1), the Social Security Commissioner makes the

determination whether a claimant meets the statutory definition of disability.  This necessarily

includes a review of all the medical findings and other evidence that support a medical source's

statement that one is disabled.  "A statement by a medical source that you are 'disabled' or

'unable to work' does not mean that we will determine that you are disabled."  *Id*.  It is the

Commissioner who must make the final decision on the ultimate issue of disability.  *Duncan*,

801 F.2d at 855;  *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Watkins v. Schweiker*,

667 F.2d 954, 958 n. 1 (11th Cir. 1982).

   In discounting Dr. Popovic's opinion, the ALJ cited inconsistencies between Dr. Popovic

and the opinions of several other treating physicians, two of whom were dermatologists with a

specialized knowledge of Hall's skin condition.  The ALJ explained that Dr. Popovic "is not a

dermatologist and is outside his area of expertise in offering such an opinion."  (Tr. 19.)

18

Pursuant to 20 C.F.R. § 404.1527(d)(5), the ALJ "will give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." Specific to Hall's skin condition, Dr. Popovic's opinion is inconsistent with the dermatologists who also offered opinions. The record includes opinions by Dr. Taylor and Dr. Nedorost, both treating physicians and both dermatologists. Importantly, Dr. Taylor, Dr. Nedorost, and the ME agreed that Hall's skin condition did not preclude him from work so long as he avoided the allergens that irritate him. As such, the ALJ did not err by giving less weight to Dr. Popovic's opinion. (Tr. 20.) Additionally, the ALJ considered the consistency of the treating opinion as compared to Hall's entire medical record. The regulation states that the more consistent an opinion is with the record as a whole, the more weight the ALJ will give to that opinion. *See* 20 C.F.R. § 404.1527(d)(4). In his decision, the ALJ specifically states that Dr. Popovic's opinion is not supported by the medical record. (Tr. 20.) The ALJ cited several instances where Dr. Popovic's assessment was wholly inconsistent with both the specialized dermatologists and general physicians which, according to the regulations, permits the ALJ to reasonably discount a treating source.

The ALJ also considered the length of the treatment relationship and the frequency of examination. From the record, it appears Dr. Popovic is one of several treating physicians. Dr. Popovic began treating Hall for his electrocution injury in 1994, and then again in 1998 for his skin conditions. Dr. Popovic last saw Hall in 2003. Subsequently, Hall also visited other doctors at the Cleveland Clinic for the treatment of his skin condition. "[Treating] sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical

19

evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d541, 544 (6th Cir. 2004).  Thus, as in Hall's situation, intermittent treatment equal in length of time to other doctors cannot demand the same preferred weight solely because the physician can be called a "treating source."  Based on length and frequency of treatment alone, Dr. Popovic cannot command more weight than the other doctors who reviewed or treated Hall.

Finally, Dr. Popovic's opinion that Hall is "unemployable" does not constitute a medical opinion, and, therefore, is not entitled to any special weight.  An opinion that a claimant is disabled is an issue expressly reserved for the Commissioner and does not constitute a medical opinion.  20 C.F.R. § 404.1527(e).  An ALJ need not give any weight to a conclusory statement of a treating physician that a claimant is disabled, and may reject determinations of such a physician when good reasons are identified for not accepting them.  *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Sec' of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir.1984).  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled," as it is the Commissioner who must make the final decision on the ultimate issue of whether an individual is able to work.  *See* 20 C.F.R. § 404.1527(e)(1); *Duncan*, 801 F.2d at 855;  *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982)

In sum, although the ALJ was not bound to give any special weight to Dr. Popovic's opinion that Hall was unable to work, the ALJ identified legitimate reasons for discounting his

opinion.

***Inaccurate Hypothetical***

In his final assertion of error, Hall claims that the hypothetical posed by the ALJ to the VE inaccurately portrayed Hall's age, education, past relevant work, and limitations. Specifically, Hall claims that the ALJ failed to consider his dermatitis flare-ups in the RFC finding.  (Pl.'s. Br. at 14.)

This argument is without merit.  The record indicates that both the ME and ALJ considered Hall's flare-ups when attempting to determine Hall's impairments.  When asked directly by the ALJ about the impact of Hall's flare-ups, Hall stated that he only experienced four or five in the past year.  (Tr. 456.)  Hall further testified that the flare-ups were not severe, because he was able to manage them well with a cream.  *Id.*  Moreover, the record reflects the ALJ did incorporate Hall's skin condition into his hypothetical by asking the VE to consider a subject who cannot wear gloves made from any material that triggers a skin allergy; who should avoid exposure to rubber or leather with his hands and his feet; and who should avoid work environments with concentrations of dust, fumes or gases.  (Tr. 463.)  These limitations clearly indicate that Hall's skin condition was considered by both the ALJ and the VE when assessing the potential jobs that would accommodate Hall's limitations and impairments.  The fact that Hall himself conceded that his skin-related flare-ups occurred only occasionally throughout the year and were manageable with treatment renders the ALJ's decision to incorporate only the aforementioned limitations in his hypothetical reasonable.  Consequently, Hall's third and final assessment of error is without merit.

**VII.  Decision**

For the foregoing reasons, the Magistrate Judge finds the decision of the Commissioner supported by substantial evidence.  Accordingly, the decision of the Commissioner should be AFFIRMED and judgment entered in favor of the defendant.

s/ Greg White  
U.S. Magistrate Judge

Date: October 22, 2009.


**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).